IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JEFF KACZYNSKI, *Individually and on behalf of others similarly situated*,  Plaintiff,  v.  LAUGHING OUT LOUD RESTAURANT GROUP, LLC ARENA TAVERN INVESTOR GROUP, LLC, ARENA TAVERN DULUTH, LLC, ARENA TAVERN KENNESAW, LLC, ARENA TAVERN SANDY SPRINGS, LLC, TONY SHAW, and MICHAEL A. MILLER,  Defendants. | CIVIL NO. |

## COMPLAINT

### INTRODUCTION

Named Plaintiff Jeff Kaczynski, by and through the undersigned counsel, brings this complaint for damages and other relief on behalf of himself and others similarly situated against Defendants and states and alleges as follows:

### PARTIES

1.      Named Plaintiff resides within the Northern District of Georgia.

2.     Named Plaintiff and others similarly situated are individuals who have been employed by Defendants in the restaurants they own and/or have owned, including but not limited to Arena Tavern – Duluth, Arena Tavern – Kennesaw, and Nacho Daddy's, and have received gratuities for services rendered from customers of those restaurants in the three years prior to the filing of this lawsuit and continuing through the duration of this action ("Tipped Employees").

3.     Defendant Laughing Out Loud Restaurant Group, LLC ("LOLRG") is a domestic Georgia corporation with its principal office address, as recorded with the Georgia Secretary of State, being 750 Hammond Drive, Building 10, Suite 200, Atlanta GA 30328.

4.     Defendant Arena Tavern Investor Group, LLC ("ATIG") is a domestic Georgia corporation with its principal office address, as recorded with the Georgia Secretary of State, being 750 Hammond Drive, Building 10, Suite 200, Atlanta GA 30328.

5.     Defendant Arena Tavern Duluth, LLC ("Arena Tavern – Duluth") is a domestic Georgia corporation with its principal office address, as recorded with the Georgia Secretary of State, being 750 Hammond Drive, Building 10, Suite 200, Atlanta GA 30328.

6.     Defendant Arena Tavern Kennesaw, LLC ("Arena Tavern – Kennesaw") is a domestic Georgia corporation with its principal office address, as recorded with the Georgia Secretary of State, being 750 Hammond Drive, Building 10, Suite 200, Atlanta GA 30328.

7.     Defendant Arena Tavern Sandy Springs LLC ("Arena Tavern – Sandy Springs") is a domestic Georgia corporation with its principal office address, as recorded with the Georgia Secretary of State, being 750 Hammond Drive, Building 10, Suite 200, Atlanta GA 30328.

8.     Defendant Tony Shaw is Chief Executive Officer and co-owner of Defendant LOLRG.

9.     Defendant Michael A. Miller is Chief Operating Officer and co-owner of Defendant LOLRG.

## JURISDICTION AND VENUE

10.     Named Plaintiff, on behalf of himself and the other Tipped Employees, brings this Collective Action against Defendants under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA") for failure to pay minimum wage and overtime compensation at the proper rate as required by the FLSA, and, therefore, this Court has original jurisdiction over this case based on 28 U.S.C. § 1331.

11.     Under 28 U.S.C. § 1391, venue is proper in the United States District Court for the Northern District of Georgia because: (1) all of the Defendants reside within the state of Georgia, and at least one Defendant resides within the Northern District of Georgia and (2) a substantial part of the events or omissions giving rise to Named Plaintiff's claims, as described in this complaint, occurred within the Northern District of Georgia.

12.     Defendants own and operate the Arena Tavern – Duluth restaurant and the Arena Tavern – Kennesaw restaurant, and, prior to it being closed by Defendants, owned and operated the Nacho Daddy's restaurant (collectively referred to as the "LOLRG Restaurants").

13.     The Arena Tavern – Duluth restaurant is located at 2000 Satellite Boulevard, Duluth, GA 30097.

14.     The Arena Tavern - Kennesaw restaurant is located at 2475 Barrett Pkwy, Kennesaw, GA 30144.

15.     Prior to being closed, Nacho Daddy's was located at 3375 Sugarloaf Parkway, Suite 101, Lawrenceville, GA 30044.

16.     The Arena Tavern – Duluth restaurant and the Arena Tavern – Kennesaw restaurant (collectively, "Arena Tavern Restaurants") are restaurants

that sell food and drink to the public, and, when it was in operation, Nacho Daddy's was a restaurant that sold food and drink to the public.

17.    Thus, the Arena Tavern Restaurants and Nacho Daddy's performed the same or similar activities.

18.    Defendants LOLRG, ATIG, Arena Tavern – Duluth, Arena Tavern – Kennesaw, and Arena Tavern – Sandy Springs all have the identical principal office address listed with the Georgia Secretary of State.

19.    Since each restaurant was opened and until Nacho Daddy's closed, Defendants have owned and operated the LOLRG Restaurants and continue to own and operate the Arena Tavern Restaurants, which have been and continue to be engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA.

20.    Since the restaurants were opened, the Defendants have been and continue to be "employers" engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA.

21.    Defendants employed the Tipped Employees, all of whom were engaged in commerce and/or in the production of goods for commerce.

22.    The LOLRG Restaurants together have had an annual gross volume of sales made or business done in excess of $500,000.00.

**FACTUAL ALLEGATIONS IN SUPPORT OF CLAIM THAT
DEFENDANTS ARE EMPLOYERS OF NAMED PLAINTIFF
AND OTHERS SIMILARLY SITUATED**

23.    Defendants Shaw and Miller jointly own and operate Defendant LOLRG.

24.    Defendants Shaw and Miller jointly own and operate Defendant ATIG.

25.    Defendants Shaw and Miller jointly own and operate Defendant Arena Tavern – Duluth.

26.    Defendants Shaw and Miller jointly own and operate Defendant Arena Tavern – Kennesaw.

27.    Defendants Shaw and Miller jointly own and operate Defendant Arena Tavern – Sandy Springs.

28.    Defendants jointly own and operate the Arena Tavern Restaurants.

29.    Prior to the closing of Nacho Daddy's, Defendants jointly owned and operated Nacho Daddy's.

30.    The Arena Tavern Restaurants perform the related activities of selling food and beverages to the public.

31.    Prior to the closing of Nacho Daddy's, the LOLRG Restaurants performed the related activities of selling food and beverages to the public.

32.     Defendant Shaw controls, determines, and directs the day-to-day operations of Defendant LOLRG.

33.     Defendant Shaw controls, determines, and directs the day-to-day operations of Defendant ATIG.

34.     Defendant Shaw controls, determines, and directs the day-to-day operations of Defendant Arena Tavern – Duluth.

35.     Defendant Shaw controls, determines, and directs the day-to-day operations of Defendant Arena Tavern – Kennesaw.

36.     Defendant Shaw controls, determines, and directs the day-to-day operations of Defendant Arena Tavern – Sandy Springs.

37.      Defendant Shaw controls, determines, and directs the day-to-day operations of the Arena Tavern Restaurants.

38.     Prior to the closing of Nacho Daddy's, Defendant Shaw controlled, determined, and directed the day-to-day operations of Nacho Daddy's.

39.     Defendant Shaw sets the Arena Tavern Restaurants' payroll, compensation, scheduling, and other employment policies and practices, including the policies and practices that form the basis of this lawsuit.

40.     Prior to the closing of Nacho Daddy's, Defendant Shaw set Nacho Daddy's payroll, compensation, scheduling, and other employment policies and practices, including the policies and practices that form the basis of this lawsuit.

41.     Defendant Shaw had the power to hire and fire the Tipped Employees.

42.     Defendant Shaw directly supervised and controlled work schedules and other terms of employment of the Tipped Employees.

43.     By way of example, Defendant Shaw reviewed and approved the weekly schedules of Tipped Employees.

44.     Defendant Shaw determined the rate and method of payment for the Tipped Employees.

45.     Defendant Shaw maintains employment records of the Tipped Employees.

46.     Defendant Shaw is the General Manager of the Arena Tavern Restaurants.

47.     Prior to its close, Defendant Shaw was the General Manager of Nacho Daddy's.

48.     Defendant Shaw has the ultimate power to make binding policy decisions for the Arena Tavern Restaurants.

49.     Prior to its close, Defendant Shaw had the ultimate power to make binding policy decisions for Nacho Daddy's.

50.     Some of Defendants' employees have worked at one of the Arena Tavern Restaurants and Nacho Daddy's.

51.     For example, Named Plaintiff began his employment with Defendants as a Server at Nacho Daddy's, then worked as a Server for both Nacho Daddy's and Arena Tavern at the same time, and subsequently worked only at the Arena Tavern – Duluth.

52.     Prior to the closing of Nacho Daddy's, the operational funds and income of Arena Tavern – Duluth and Nacho Daddy's were commingled.

53.     Prior to the closing of Nacho Daddy's, profits from both Arena Tavern – Duluth and Nacho Daddy's were intermingled.

54.     For example, employees at both Arena Tavern - Duluth and Nacho Daddy's were paid by Defendant LOLRG out of its common funds, which were the result of the revenue of both Arena Tavern - Duluth and Nacho Daddy's

55.     On information and belief, the operational funds and income of the Arena Tavern Restaurants are commingled.

56.     On information and belief, profits from both of the Arena Tavern Restaurants are intermingled.

57.     Defendant Miller controls, determines, and directs the day-to-day operations of Defendant LOLRG.

58.     Defendant Miller controls, determines, and directs the day-to-day operations of Defendant ATIG.

59.     Defendant Miller controls, determines, and directs the day-to-day operations of Defendant Arena Tavern – Duluth.

60.     Defendant Miller controls, determines, and directs the day-to-day operations of Defendant Arena Tavern – Kennesaw.

61.     Defendant Miller controls, determines, and directs the day-to-day operations of Defendant Arena Tavern – Sandy Springs.

62.     Defendant Miller makes decisions with Defendant Shaw in directing the day-to-day operations of the Arena Tavern Restaurants.

63.     Prior to the closing of Nacho Daddy's, Defendant Miller made decisions with Defendant Shaw in directing the day-to-day operations of Nacho Daddy's.

64.     Defendant Miller makes decisions with Defendant Shaw in setting the Arena Tavern Restaurants' payroll, compensation, scheduling, and other employment policies and practices.

65.     Prior to the closing of Nacho Daddy's, Defendant Miller made decisions with Defendant Shaw in setting Nacho Daddy's payroll, compensation, scheduling, and other employment policies and practices

66.     Defendant Miller had the power to hire and fire the Tipped Employees.

67.     Defendant Miller occasionally supervised the Tipped Employees.

68.     For example, Defendant Miller occasionally requested that a Tipped Employee clean or pick up trash.

69.     Defendant Miller made decisions with Defendant Shaw in determining the rate and method of payment for Tipped Employees.

70.     Defendant Miller maintains some employment records of Tipped Employees.

71.     On information and belief, Defendants Shaw and Miller control and operate the other Defendants through common corporate ownership, common corporate officers, and common ownership of business and work-related facilities, fixtures, and investments.

72.     Named Plaintiff and the other Tipped Employees have performed work that benefits each of the Defendants.

73.    Defendant LOLRG was an employer of the Tipped Employees for the purposes of the FLSA.

74.    Defendant ATIG was an employer of the Tipped Employees for the purposes of the FLSA.

75.    Defendant Arena Tavern – Duluth was an employer of the Tipped Employees for the purposes of the FLSA.

76.    Defendant Arena Tavern – Kennesaw was an employer of the Tipped Employees for the purposes of the FLSA.

77.    Defendant Arena Tavern – Sandy Springs was an employer of the Tipped Employees for the purposes of the FLSA.

78.    Defendants Shaw was an employer of the Tipped Employees for the purposes of the FLSA.

79.    Defendant Miller was an employer of the Tipped Employees for the purposes of the FLSA.

## FACTUAL ALLEGATIONS IN SUPPORT OF NAMED PLAINTIFF'S CLAIMS ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED

80.    Named Plaintiff began his employment with Defendants as a Server at Nacho Daddy's in approximately March 2009 and worked there until approximately June 2009.  He then began working as a Server for both Nacho

Daddy's and Arena Tavern – Duluth at the same time, and subsequently worked only at the Arena Tavern – Duluth until approximately January 27, 2012. Named Plaintiff also occasionally picked up bartending shifts at Arena Tavern – Duluth when he was employed there.

81.    Defendants used a point of sale system in the restaurants they own and jointly operated, i.e., the Arena Tavern – Restaurants and Nacho Daddy's (until it closed), to record and track Tipped Employees' sales, tips, and hours worked.

## COUNT I

## DEFENDANTS' WILLFUL FAILURE TO PAY TIPPED EMPLOYEES THE MINIMUM WAGE REQUIRED BY THE FLSA

82.    The Tipped Employees were paid $2.13 per hour in direct wages when they were employed by Defendants.

83.    The Tipped Employees received gratuities from customers of Defendants' restaurants for services rendered ("tips").

84.    Customers at Defendants' restaurants left tips for Tipped Employees in the form of both cash tips and credit card tips. These tips are amounts left for Tipped Employees in excess of the amount of the customers' bills.

85.    Defendants operate their restaurants such that each Tipped Employee operated as his or her own "bank" during the course of the shift. This means that

each Tipped Employee retained for the duration of his or her shift all of the cash that he or she received from customers during his or her shift.

86.    At the end of a Tipped Employee's shift, a manager or the Tipped Employee printed a receipt from the point of sale computer system that detailed the Tipped Employee's total sales, including credit card sales and non-credit card sales, for that shift ("End of Shift Receipt").

87.    The End of Shift Receipt also indicated the total amount of credit card tips received by the Tipped Employee during his or her shift.

88.    The End of Shift Receipt also indicated whether the Tipped Employee was owed cash by Defendant LOLRG or whether the Tipped Employee owed Defendant LOLRG cash.

89.    If the Tipped Employee's total credit card tips were more than his or her total non-credit card sales, then Defendant LOLRG owed the Tipped Employee cash, which Defendant LOLRG paid to the Tipped Employee at or near the end of the shift.

90.    If the Tipped Employee's total credit card tips were less than his or her total non-credit card sales, then the Tipped Employee owed Defendant LOLRG the difference and was required to pay the difference to Defendant LOLRG at or near the end of the shift out of the cash collected during the shift.

91.    For example, if a Tipped Employee had one customer ("Customer A") with a bill of $100 who left a tip of $15 and paid both the bill and the tip with a credit card and had a second customer ("Customer B") with a bill of $10 who left no tip and paid in cash, the Tipped Employee's total sales would be $110.

92.    At the end of the shift, the Tipped Employee would have received $15 in tips, all of which came from Customer A in this example.

93.    At the end of the shift, the Tipped Employee would have $10 in cash, which is the cash she would have received from Customer B when he paid his bill.

94.    Since the Tipped Employee's total credit card tips ($15) are $5 more than the Tipped Employee's total non-credit card sales ($10), the Tipped Employee's End of Shift Receipt would indicate that Defendant LOLRG owed the Tipped Employee $5 in cash.

95.    When Defendants' manager "settled up" the Tipped Employee's "bank," the Tipped Employee would receive $5 in cash from Defendant LOLRG. The Tipped Employee would therefore take home $15 in cash, which is the amount of cash equal to her total tips for the shift, which in this example includes only the $15 tip received from Customer A and paid by credit card.

96.    However, the calculation of whether the Tipped Employee was owed cash by Defendant LOLRG or owed cash to Defendant LOLRG at the end of the

shift was not performed in such a way so as to ensure that the Tipped Employee retained all tips left for him or her by his or her customers.

97.     During Named Plaintiff's employment, Defendants maintained a practice and a policy that made "walkouts" and other cash shortages the responsibility of the Tipped Employee.

98.     Therefore, if the Tipped Employee had a customer or customers who did not pay their bill in full, the unpaid amount of the customer's bill was deducted from the Tipped Employee's tips at the end of the shift when the determination of whether the Tipped Employee owed Defendant LOLRG cash or Defendant LOLRG owed the Tipped Employee cash.

99.     For example, if a Tipped Employee had one customer ("Customer C") with a bill of $100 who left a tip of $15 and paid both the bill and the tip with a credit card and had a second customer ("Customer D") with a bill of $10 who walked out without paying the bill, the Tipped Employee's total sales would be $110.

100.   At the end of the shift, the Tipped Employee would have received $15 in tips, all of which came from Customer C in this example.

101.   Since the Tipped Employee's total credit card tips ($15) would be $5 more than the Tipped Employee's total non-credit card sales ($10), the Tipped

Employee's End of Shift Receipt would indicate that Defendant LOLRG owed the Tipped Employee $5 in cash.

102.   At the end of the shift, however, the Tipped Employee would not have received any cash during her shift because Customer D did not pay his bill.

103.   When Defendants' manager "settled up" the Tipped Employee's "bank," the Tipped Employee would receive $5 in cash.  The Tipped Employee would therefore take home $5 in cash, which is $10 less than her total tips received for the shift, which in this example includes only the $15 tip received from Customer C and paid by credit card.

104.   Thus, in this example, the Tipped Employee would not be allowed to retain all of her tips.

105.   The Tipped Employees, including Named Plaintiff, were subject to this policy and practice of Defendants and have not been allowed to retain all of their tips.

106.   Defendants regularly communicated this policy and practice to Tipped Employees.

107.   For example, at the beginning of each shift, Defendants' managers had a "line up" where managers went over the specials for the day and general things going on in the restaurant.

108.   Several times during these line ups, especially during busy shifts, managers would remind Tipped Employees of the "walkout" policy.

109.   Defendants failed to maintain accurate records of deductions from Tipped Employees' wages, including Named Plaintiff's tips.

110.   Defendants failed to maintain accurate records of Tipped Employees' actual hours worked.

111.   Defendants manually altered Tipped Employees' time records.

112.   On information and belief, Defendants have destroyed relevant time records and work schedules for Tipped Employees.

113.   Therefore, Defendants failed to comply with the record-keeping requirements of the FLSA.

114.   Count I of this complaint arises from Defendants' willful violation of the FLSA for failing to pay the minimum wage to Tipped Employees, including Named Plaintiff, for all hours worked and to which they were entitled.

115.   The minimum wage provisions of the FLSA apply to the Defendants and protect the Tipped Employees, including Named Plaintiff.

116.   Defendants were not and are not entitled to avail themselves of the federal tipped minimum direct wage rate under the FLSA because Defendants

failed to properly notify the Tipped Employees, including Named Plaintiff, of Defendants' intention to take a tip credit against the required minimum wage.

117.   Defendants were not and are not entitled to avail themselves of the federal tipped minimum direct wage rate under the FLSA because Defendants did not allow the Tipped Employees, including Named Plaintiff, to retain all of their tips.

118.   Since Defendants were not and are not entitled to avail themselves of the federal tipped minimum direct wage rate, the Tipped Employees who worked for Defendants at any time from June 4, 2009, through July 23, 2009, are entitled to be compensated at the then current minimum wage rate of $6.55 per hour for every hour worked less than 40 in a workweek.

119.   Since Defendants were not and are not entitled to avail themselves of the federal tipped minimum direct wage rate, the Tipped Employees who worked for Defendants at any time from July 24, 2009, through and including the present, were and are entitled to be compensated at the current minimum wage rate of $7.25 per hour for every hour worked less than 40 in a workweek.

120.   Defendants did not pay the Tipped Employees, including Named Plaintiff, the required minimum wage for all hours worked per workweek, including hours worked off-the-clock and hours worked on-the-clock.

121.   Defendants, pursuant to their policies and practices, willfully refused and willfully failed to pay the minimum wage required by the FLSA to the Tipped Employees, including Named Plaintiff.

122.   By failing to properly compensate the Tipped Employees, including Named Plaintiff, at the minimum wage required by the FLSA, Defendants violated and continue to violate the Tipped Employees' statutory rights under the FLSA.

123.   Defendants' failure to pay the minimum wage to the Tipped Employees, including Named Plaintiff, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255.

124.   Named Plaintiff, on behalf of himself and the other Tipped Employees, seeks damages in an amount of the Tipped Employees' unpaid wages, liquidated damages in an equal amount as provided under the FLSA, and any such other relief as the Court deems proper.

125.   Named Plaintiff, on behalf of himself and the other Tipped Employees, seeks recovery of their attorney's fees and costs to be paid by Defendants as provided by the FLSA.

## COUNT II

## DEFENDANTS' WILLFUL FAILURE TO PAY TIPPED EMPLOYEES FOR ALL HOURS WORKED IN EXCESS OF 40 HOURS PER WORKWEEK AT THE REQUIRED OVERTIME RATE IN VIOLATION OF THE FLSA

126. Tipped Employees, including Named Plaintiff, recorded their hours worked using the point of sale system.

127. Upon arriving to work, Tipped Employees, including Named Plaintiff, clocked in for their shift by logging into the point of sale computer system.

128. The point of sale computer system recorded a Tipped Employee's shift start time to the minute.

129. When Tipped Employees, including Named Plaintiff, completed their shift, the Tipped Employees clocked out for their shift by logging out of the point of sale computer system.

130. The point of sale computer system recorded a Tipped Employee's shift end time to the minute.

131. Each time a Tipped Employee clocked out at the end of a shift, a receipt was printed that showed the Tipped Employee's shift start time, shift stop time, total time worked on the shift, and total time worked for that workweek ("Time Receipt").

132.    Servers worked different types of shifts based on their scheduled start and end times.

133.    For example, Servers worked shifts known as "volume shifts."

134.    When working a volume shift, a Server was scheduled as working from his or her scheduled start time through "first out," which means that he or she was one of the first Servers "cut" in the evening depending on how busy the restaurant was.

135.    When working a volume shift, a Server generally clocked in at approximately his or her scheduled shift start time and worked through being cut in the evening, at which point the Server clocked out.

136.    Servers also worked shifts known as "double shifts."

137.    A double shift included working a lunch shift and a dinner shift on the same day.

138.    When working a double shift, a Server generally clocked in and worked from his or her start time through lunch when he or she was then "cut," at which point the Server clocked out for the lunch shift.

139.    After clocking out for the lunch shift, the Server was free to leave.

140.   However, the Server was responsible for the cash that he or she had received and generally maintained possession of the cash through the time that he or she was off the clock between the lunch shift and the dinner shift.

141.   After the break, a Server generally returned, clocked in, and worked from his or her start time through being cut, which was usually at or near the closing of the restaurant for the day, at which point the Server clocked out for the day.

142.   Defendants had a policy and practice of regularly not paying Tipped Employees for hours worked in excess of 40 hours in a workweek at the required premium overtime rate.

143.   More specifically, Defendants had a policy and practice of regularly not paying Tipped Employees at all for hours worked in excess of 40 hours in a workweek.

144.   When a Tipped Employee's time receipts evidenced more than 40 hours of work per workweek, Defendants would adjust the Tipped Employee's total reported hours so that they were less than 40.

145.   The Tipped Employees, including Named Plaintiff, were subject to these policies and practices of Defendants and have not been properly paid for all hours they have worked in excess of 40 hours in a workweek.

146. Thus, Tipped Employees were not paid for all hours worked evidenced by their clock in and clock out times in Defendants' point of sale system.

147. Rather than using Tipped Employee's hours recorded in the point of sale system, Defendants paid Tipped Employees based on the hours manually adjusted and recorded by a manager.

148. Defendants did not have Tipped Employees approve the changes in the Tipped Employees' hours as recorded in the point of sale system.

149. On information and belief, Defendants have destroyed relevant time records and work schedules for Tipped Employees.

150. Defendants failed to maintain accurate records of Tipped Employees' actual work hours, including Named Plaintiff's, actual hours worked.

151. Therefore, Defendants failed to comply with the record-keeping requirements of the FLSA.

152. Defendants regularly, frequently, and repeatedly failed to pay Tipped Employees, including Named Plaintiff, for all hours worked in excess of 40 hours in a workweek at the appropriate premium overtime rate required by the FLSA.

153. Count II arises from Defendants' willful violation of the FLSA for failure to pay overtime compensation at the appropriate overtime premium rate for

all hours worked in excess of 40 hours per workweek to the Tipped Employees, including Named Plaintiff, to which they were entitled as required by the FLSA.

154.   The overtime provisions of the FLSA apply to Defendants and protect Named Plaintiff and the other Tipped Employees.

155.   Defendants, pursuant to their policies and practices, willfully refused and failed to pay the Tipped Employees at the premium overtime rate for all hours worked in excess of 40 hours per workweek.

156.   Defendants' conduct as alleged constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255.

157.   Named Plaintiff, on behalf of himself and the other Tipped Employees, seeks damages in the amount of their unpaid overtime wages, liquidated damages as in an equal amount as provided under the FLSA, and any such other relief as the Court deems proper.

158.   Named Plaintiff, on behalf of himself and the other Tipped Employees, seeks recovery of attorney's fees and costs to be paid by Defendants as provided by the FLSA.

## **PRAYER FOR RELIEF**

Based on the allegations set forth in this complaint and the evidence as it is developed in this case, Named Plaintiff, on behalf of himself and the other Tipped Employees, respectfully prays that:

- the Court enter judgment in favor of Named Plaintiff and the other Tipped Employees as to Count I of this complaint and award them (1) the full applicable minimum wage for each hour worked less than 40 per workweek in the three years prior to the filing of the complaint that initiated this action and continuing through the present and (2) an equal amount in liquidated damages as provided for under the FLSA;

- the Court enter judgment in favor of Named Plaintiff and the other Tipped Employees as to Count II of this complaint and award them (1) the full amount of all unpaid overtime for each hour worked in excess of 40 per workweek in the three years prior to the filing of the complaint that initiated this action and continuing through the present and (2) an equal amount in liquidated damages as provided for under the FLSA;

- the Court enter judgment against Defendants that their violations of the FLSA were willful;

- the Court award Named Plaintiff and the other Tipped Employees their attorney's fees and litigation expenses; and

- the Court grant Named Plaintiff and the other Tipped Employees all other further relief, equitable or otherwise, as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Named Plaintiff, on behalf of himself and the other Tipped Employees, demands a trial by jury.

Dated:  June 18, 2012

Respectfully submitted,

s/G. Blake Andrews
_____
Gary Blaylock "Blake" Andrews, Jr.
Georgia Bar No. 019375
Andrews & Stembridge, LLC
1904 Monroe Drive, Suite 130
Atlanta, GA 30324
Telephone: 770-828-6225
Facsimile: 866-828-6882
blake@blakeandrewslaw.com